**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **MONICA GARTH,** | ) | |
| | ) | **MDL NO. 2873** |
| | ) | |
| **Plaintiff,** | ) | **Master Docket No:  2:18-mn-2873-RMG** |
| | ) | |
| | ) | **JUDGE RICHARD GERGEL** |
| **v.** | ) | |
| | ) | **Civil Action No:  2:23-cv-02117-RMG** |
| **3M COMPANY (f/k/a Minnesota** | ) | |
| **Mining and Manufacturing Company),** | ) | |
| | ) | **COMPLAINT AND** |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, by and through undersigned counsel, and alleges upon information and belief as follows:

## INTRODUCTION

1.    Plaintiff brings this action for damages for personal injury resulting from exposure to the toxic chemicals collectively known as per and polyfluoroalkyl substances ("PFAS"). PFAS includes, but is not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals including those that degrade to PFOA and/or PFOS.

2.    Defendant collectively designed, marketed, developed, manufactured, distributed, released, promoted, sold, and/or otherwise inappropriately disposed of PFAS chemicals with knowledge that it was highly toxic and bio persistent, which would expose plaintiff to the risks associated with PFAS.

3.      PFAS binds to proteins in the blood of humans exposed to the material and remains and persists over long periods of time. Due to their unique chemical structure, PFAS accumulates in the blood and body of exposed individuals.

4.      PFAS are highly toxic and carcinogenic chemicals. Defendant knew, or should have known, that PFAS remain in the human body while presenting significant health risks to humans.

5.      Plaintiff was unaware of the dangerous PFAS in his drinking water and unaware of the toxic nature of the Defendant's PFAS in general. Plaintiff's consumption of PFAS from Defendant's contamination and inappropriate disposal caused Plaintiff to develop the serious medical conditions and complications alleged herein.

6.      Through this action, Plaintiff seeks to recover compensatory and punitive damages arising out of the permanent and significant damages sustained as a direct result of exposure to Defendant's PFAS at various locations. Plaintiff further seeks injunctive, equitable, and declaratory relief arising from the same.

## JURISIDICTION AND VENUE

7.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332(a)(1), because the Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

8.      Venue is proper in this District Court pursuant to this Court's Case Management Order ("CMO") No. 3. Plaintiff states that but for the Order permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the Northern District of Alabama. Further, in accordance with CMO 3, Plaintiff designates the United States District Court for the Northern District of Alabama as the home venue. Venue is originally proper in the District Court pursuant to 28 U.S.C. §1391

because it is the judicial district in which Plaintiff was a resident and/or citizen, a substantial part of the events or omissions giving rise to the claims occurred, and Defendant conducts business within the district.

## PARTIES

9.      Monica Garth ("Plaintiff") is a resident and citizen of Courtland, Alabama. Plaintiff was exposed to PFAS chemicals through drinking water both at home and at his place of work, due to contamination on behalf of the 3M plant in Decatur, Alabama and potential AFFF sources.

10.     Plaintiff was diagnosed with thyroid disease as a result of exposure to Defendant's PFAS contamination.

11.     Defendant is a designer, marketer, developer, manufacturer, distributor, releaser, promotors and seller of PFAS chemicals. The Defendant, at all times relevant to this lawsuit, manufactured, designed, marketed, distributed, sold, and/or otherwise released, PFAS into various locations such that Defendant knew or should have known Plaintiff would be exposed to said chemicals.

12.     Defendant, 3M Company, f/k/a Minnesota Mining and Manufacturing Company, ("3M"), is a Delaware corporation and does business throughout the United States. 3M has its principal place of business at 3M Center, St. Paul, Minnesota 55133.

13.     3M designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used PFAS which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold

and/or otherwise handled and/or used underlying chemicals and/or products which contained PFAS.

## FACTUAL ALLEGATIONS

14.     Defendant designed, marketed, developed, manufactured, distributed, and released toxic PFAS or PFAS byproducts.

15.     Defendant designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used PFAS, in such a way as to cause the contamination of Plaintiff's blood and/or body with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or body of Plaintiff.

16.     During its several decades of operation, the 3M Decatur plant also generated, stored, and disposed of PFAS and toxic contaminants in an inappropriate and dangerous manner.

17.     3M's practices, toxic releases, discharges, and dumping of PFAS chemicals resulted in extensive pollution on site and in the surrounding areas, contaminating the Tennessee River and several other drinking water sources, causing plaintiff's injuries.

18.     PFAS are highly fluorinated synthetic chemical compounds whose family include PFOS and PFOA.

19.     PFAS have been used for decades. The PFAS family of chemicals are entirely human-made and do not naturally occur or otherwise exist.

20.     Prior to commercial development and large-scale manufacture and use PFAS and PFAS containing products, no such PFAS had been found or detected in human blood.

### A.     PFAS Hazardous Effects on Humans

21.     PFAS and its components are associated with a wide variety of adverse health effects in humans.

22.     Exposure to Defendant's PFAS has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular cancer, liver cancer, testicular tumors, pancreatic cancer, prostate cancer, leukemia, lymphoma, bladder cancer, thyroid disease and infertility.

23.     By at least the end of the 1960s, animal toxicity testing performed by Defendant, as a manufacturer and user of PFAS and PFAS products, indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

24.     By at least the end of the 1960s, additional research and testing performed by Defendant, as a manufacturer and user of PFAS and PFAS products, indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

25.     By at least the end of the 1970s, additional research and testing performed by Defendant, as a manufacturer and user of PFAS and PFAS products, indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would remain and persist over long periods of time and would accumulate in the blood/body of the exposed individuals with each additional exposure.

26.     By at least the end of the 1980s, additional research and testing performed by Defendant, as a manufacturer and user of PFAS and PFAS products, indicated that at least one such PFAS, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats.

27.      It was understood by Defendant by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and would not occur in humans.

28.      By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors. Therefore, scientific principles of carcinogenesis classification mandated that Defendant presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

29.      By at least the end of the 1980s, additional research and testing performed by Defendant , as a manufacturer and user of PFAS and PFAS products, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

30.      By at least the end of the 1980s, Defendant, understood that, not only did PFAS, including at least PFOA and PFOS, get into and persist and accumulate in the human blood and in the human body, but that once in the human body and blood, particularly the longer-chain PFAS, such as PFOS and PFOA, had a long half-life. Meaning that it would take a very long time before even half of the material would start to be eliminated, which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposure continued.

31.      By at least the end of the 1990s, additional research and testing performed by Defendant, as a manufacturer and user of PFAS and PFAS products, indicated that at least one such PFAS,

6

PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

32.     By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS caused each of the tumors found in animal studies had still not been identified, mandating that Defendant continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

33.     By at least 2010, additional research and testing performed by Defendant, as a manufacturer and/or user of PFAS and PFAS products, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

34.     When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposure in the United States and potential associated adverse health effects, Defendant repeatedly assured and represented to such entities and the public that such exposure presented no risk of harm and were of no significance.

35.     After the USEPA and other entities began asking Defendant to stop manufacturing and/or using certain PFAS, Defendant began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

36.     Defendant, as a manufacturer and user of PFAS and PFAS products, is aware that one or more such Short-Chain PFAS materials also have been found in human blood.

37.     By at least the mid-2010s, Defendant was aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

38.     Research and testing performed by and/or on behalf of Defendant making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same, similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

39.     Nevertheless, Defendant repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including Short-Chain PFAS, in human blood at the levels found within the United States present no risk of harm and is of no legal, toxicological, or medical significance of any kind.

40.     At all relevant times, Defendant, possessed the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature that Defendant claims is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendant deem acceptable.

41.     Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendant repeatedly assured and represented to governmental entities, their customers, and the

public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate.

42.    At all relevant times, Defendant shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

43.    As of the present date, blood serum testing and analysis by Defendant, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically demonstrably present in approximately 99% of the current population of the United States.

44.    There is no naturally-occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendant.

45.    At all relevant times, Defendant, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

46.    At all relevant times, Defendant, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements,

and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

47.     At all relevant times, Defendant, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiff to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in Plaintiff's blood.

48.     At all relevant times, Defendant encouraged the continued and even further increased use of PFAS by their customers and others, including but not limited to the manufacture, use, and release, of PFAS and tried to encourage and foster the increased and further use of PFAS in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

49.     To this day, Defendant denies that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

50.     To this day, Defendant denies that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

51.     Defendant, to this day, affirmatively asserts and represents to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing

studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

52.    Defendant was and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of PFAS would result in the contamination of the blood and/or body of Plaintiff with PFAS, and the biopersistence and bioaccumulation of such PFAS in his blood and/or body.

53.    Defendant was and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiff would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiff.

54.    Defendant did not seek or obtain permission or consent from Plaintiff before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiff's exposure to PFAS and the contamination of Plaintiff's blood and/or body with PFAS materials, and resulting biopersistence and bioaccumulation of such PFAS in his blood and/or body.

**B.    Defendant's History of Manufacturing and Selling PFAS related products**

55.    3M began producing PFOS and PFOA by electrochemical fluorination in the 1940s.  In the 1960s, 3M used its fluorination process to develop AFFF.

56.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.

57.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environment

management." 3M further stated that "the presence of these materials at very low levels does not pose a human health or environmental risk." In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

58.     Defendant knew their customers warehoused large stockpiles of AFFF. In fact, Defendant marketed their AFFF products by touting its shelf-life. Even after Defendant fully understood the toxicity of PFAS, and their impacts to the health of humans following exposure, Defendant concealed the true nature of PFAS. While Defendant phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFAS and/or their precursors. Defendant further did not act to get their harmful products off the market.

59.     Defendant did not warn public entities, firefighter trainees who they knew would foreseeably come into contact with their PFAS, AFFF, and other PFAS products, or firefighters employed by either civilian and/or military employers that use of and/or exposure to Defendant's AFFF products containing PFAS and/or its precursors would pose a danger to human health

60.     The Plaintiff was exposed to PFAS contamination, directly through contaminated drinking water.

61.     The Plaintiff was never informed that the water was dangerous. Nor was the Plaintiff warned about the known health risks associated with 3M's PFAS chemicals.

62.     The Plaintiff never received instruction to avoid drinking the water.

63.     Defendant have known of the health hazards associated with PFAS and/or its compounds for decades and that in their intended and/or common use would harm human health.

64.     Information regarding PFAS and its compounds were readily accessible to the Defendant for decades because each is an expert in the field of PFAS manufacturing and/or the materials

needed to manufacture PFAS, and each has detailed information and understanding about the chemical compounds that form PFAS products.

65.    3M's manufacture, storage, and release of PFAS resulted in the Plaintiff and other individuals who came in contact with the chemical to develop cancer.

66.    The Defendant through their manufacturing, storing, and inappropriate releases of PFAS, knew, foresaw, and/or should have known and/or foreseen that the Plaintiff and those similarly situated would be harmed.

67.    The Defendant's products were unreasonably dangerous, and the Defendant failed to warn of this danger.

## CAUSES OF ACTION

## COUNT I – NEGLIGENCE

68.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

69.    Negligence may exist both as an omission as well as an affirmative act. A claim of negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.

70.    Here, the Defendant, as owners and operators of business(es) at the Site that managed, stored, used and disposed of toxic contaminants and solvents, owed Plaintiffs a cognizable duty to exercise reasonable care in the storage, transportation, and disposal of toxic chemicals including but not limited to the Contaminants, and in the maintenance of their tools and equipment used for such acts.

71.    Defendant breached their duty of reasonable care which a reasonably prudent person should use under the circumstances by causing and/or allowing and/or failing to prevent the

releases of PFAS chemical into the water in and around the Site and the surrounding neighborhoods, where they caused toxic exposure to Plaintiff and the contamination of their homes.

72.    The releases of PFAS and PFAS byproducts into the Tennessee River and groundwater is the proximate and legal cause of the injuries suffered by the Plaintiff to their health and wellbeing and to their properties and the adjacent properties.

73.    Defendant breached that duty by failing to timely notify the Plaintiff of the releases of PFAS.

74.    As a direct and proximate result of Defendant's negligence, the Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

75.    Defendant breached their duty by failing to act reasonably to remediate, contain, and eliminate the contamination before it injured the Plaintiff.

76.    Defendant had a legal duty to properly remediate the contamination from their activities at the Site and had full knowledge of the extent of the contamination and the threat it poses to human health and safety.

WHEREFORE, the Plaintiff prays judgments against the Defendant for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## **COUNT II – BATTERY**

77.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

78.     At all relevant times, Defendant possessed knowledge that the PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were bio- persistent, bio-accumulative, toxic, potentially carcinogenic, and/or otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiff having PFAS in Plaintiff's blood, and the biopersistence and bioaccumulation of such PFAS in Plaintiff's blood.

79.     However, despite possessing such knowledge, Defendant knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiff accumulating PFAS in Plaintiff's blood and/or body, and such PFAS persisting and accumulating in Plaintiff's blood and/or body.

80.     Defendant did not seek or obtain permission or consent from Plaintiff to put or allow PFAS materials into Plaintiff's blood and/or body, or to persist in and/or accumulate in Plaintiff's blood and/or body.

81.     Entry into, persistence in, and accumulation of such PFAS in Plaintiff's body and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiff's person and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's blood and/or body.

82.     At all relevant times, the PFAS present in the blood of Plaintiff originated from Defendant's acts and/or omissions.

83. Defendant continues to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiff that resulted in persisting and accumulating levels of PFAS in Plaintiff's blood.

84. Plaintiff, and any reasonable person, would find the contact at issue harmful and/or offensive.

85. Defendant acted intentionally with the knowledge and/or belief that the contact, presence and/or invasion of PFAS with, onto and/or into Plaintiff's blood serum, including its persistence and accumulation in such serum, was substantially certain to result from those very acts and/or omissions.

86. Defendant's intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's blood and/or body.

87. The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiff is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

88. The presence of PFAS in the blood and/or body of Plaintiff altered the structure and/or function of such blood and/or body parts and resulted in cancer.

89. As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical injury for which Defendant is therefore liable.

WHEREFORE, the Plaintiff prays judgments against the Defendant for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## **COUNT III – ABNORMALLY DANGEROUS ACTIVITY**

89. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

16

90.    Activities such as the disposal of hazardous chemical wastes as is the case herein constitutes an abnormally dangerous activity for which strict liability will apply.

91.    Defendant's aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, transporting, disposing of, or otherwise handling toxic substances, including PFAS, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

92.    Defendant allowed or caused these ultra-hazardous and abnormally dangerous substances to be released into the surrounding land, groundwater, and river, and in doing so, failed to warn Plaintiff of the dangerous condition that was caused thereby.

93.    The risks posed by such activities outweigh any value associated with the same. As the result of said ultra-hazardous and abnormally dangerous activities, Plaintiff has suffered damages and imminent, substantial, and impending harm to their health, families, and home values. Plaintiff has expended and will be forced to expend significant resources to address their injuries caused by the contamination indefinitely for years and decades into the future.

94.    By reason of the foregoing, Defendant is strictly liable in tort for the damages sustained by Plaintiffs.

    WHEREFORE, the Plaintiff prays judgments against the Defendant for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT IV – FRAUDULENT CONCEALMENT

95.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

17

96.     Throughout the relevant time period, Defendant knew that PFAS was defective and unreasonably unsafe for their intended purpose.

97.     Defendant fraudulently concealed from and/or failed to disclose to or warn the Plaintiff, and the public that PFAS was defective, unsafe, and unfit for the purposes intended.

98.     Defendant was under a duty to the Plaintiff and the public to disclose and warn of the defective and harmful nature of PFAS because:

   a)  Defendant was in a superior position to know the true quality, safety and efficacy of the Defendant's products;

   b)  Defendant knowingly made false claims about the safety and quality of the Defendant's product in documents and marketing materials; and

   c)  Defendant fraudulently and affirmatively concealed the defective nature of the Defendant's products from the Plaintiff.

99.     The facts concealed and/or not disclosed by Defendant to the Plaintiff were material facts that a reasonable person would have considered to be important.

100.    Defendant intentionally concealed and/or failed to disclose the true defective nature of PFAS so that the Plaintiff would use the Defendant's products, the Plaintiff justifiably acted or relied upon, to Plaintiff's detriment, the concealed and/or non-disclosed facts.

101.    Defendant, by concealment or other action, intentionally prevented the Plaintiff from acquiring material information regarding the lack of safety and effectiveness of PFAS and are subject to the same liability to the Plaintiff for Plaintiff's pecuniary losses, as though Defendant had stated the non-existence of such material information regarding PFAS's lack of safety and effectiveness and dangers and defects, and as though Defendant had affirmatively stated the non-existence of such matters that the Plaintiff was thus prevented from discovering the truth.

Defendant therefore has liability for fraudulent concealment under all applicable laws, including, inter alia, Restatement (Second) of Torts §550 (1977).

102.     As a proximate result of Defendant's conduct, the Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

WHEREFORE, the Plaintiff prays judgments against the Defendant for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT V – NUISANCE

103.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

104.     Under a cause of action for private nuisance, Parties may be subject to liability for environmental contamination if their conduct invades another's private use and enjoyment of land and if such invasion is: 1) intentional and unreasonable; 2) negligent or reckless; or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities.

105.     Defendant owned, occupied, controlled and/or still owns, occupies and controls their real property in such a way as to create and/or maintain and continue a dangerous and/or hazardous condition.

106.     At all times mentioned herein, Defendant had knowledge and/or notice of the dangerous condition that the PFAS presented and failed to take reasonable acts to cleanup, correct, or remediate that condition.

107.    Additionally, Defendant owed a duty to Plaintiffs to take reasonable action to eliminate, correct, or remedy any dangerous that was reasonably foreseeable to injure Plaintiff and of which they had knowledge and/or notice.

108.    Defendant breached these duties by negligently, willfully, and/or wantonly creating a dangerous condition on their property by allowing massive quantities toxic PFAS to be spilled, disposed of, or otherwise released into the ground, soil, groundwater, and Tennessee River. This dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiff due to the size and nature of the releases of the Contaminants.

WHEREFORE, the Plaintiff prays judgments against the Defendant for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT VI – WANTONNESS

109.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

110.    Defendant and their employees, agents, officers, and representatives owed a duty of care to everyone in the surrounding communities, including Plaintiff.

111.    Defendant breached the duty of care owed to the Plaintiff.

112.    The actions of Defendant and their employees, agents, officers, and representatives were willful and wanton and exhibited a reckless disregard for the life, health, and safety of those exposed to Defendant's PFAS, including Plaintiff.

113.    As a proximate and foreseeable consequent of the actions of Defendant, Plaintiff was exposed to unreasonably dangerous toxic PFAS, which caused Plaintiff's injury.

WHEREFORE, the Plaintiff prays judgments against the Defendant for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

114.  Plaintiff had no way of knowing his drinking water was contaminated with Defendant's PFAS chemicals and Plaintiff had no way of knowing about the risk of serious injury associated with drinking the water.

115.  Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that the drinking water was contaminated with dangerous PFAS chemicals, harmful to human health.

116.  Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with his drinking water; nor would a reasonable and diligent investigation by Plaintiff have disclosed that the drinking water was contaminated with harmful chemicals.

117.  For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

118.  All applicable statute of limitations have also been tolled by Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

119.  Instead of disclosing critical safety information regarding PFAS, Defendant has consistently and falsely represented the safety of PFAS products.

120.    This fraudulent concealment continues through present day.

121.    Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Estoppel

122.    Defendant was under a continuous duty to Plaintiff and other persons coming into contact with their contamination, to accurately provide safety information concerning its products and the risk associated with the use of and exposure to PFAS.

123.    Instead, Defendant knowingly, affirmatively, and actively concealed safety information concerning PFAS and the serious risks associated with the manufacture, disposal of and exposure to PFAS.

124.    Based on the foregoing, Defendant is estopped from relying on any statute of limitations in defense of this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and Causes of Action as follows:

Awarding compensatory damages to Plaintiff for past and future damages, including but not limited, to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

Punitive and/or exemplary damages for the wanton, willful, fraudulent, and/or reckless acts of the Defendant, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the Plaintiff and of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct;

Awarding Plaintiff attorneys' fees;

Awarding Plaintiff the costs of these proceedings; and

Such other and further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

The Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

**ENVIRONMENTAL LITIGATION GROUP, P.C.**

*/s/ Gregory A. Cade*
Gregory A. Cade
Gary A. Anderson
Kevin B. McKie
ENVIRONMENTAL LITIGATION GROUP, P.C.
2160 Highland Avenue South
Birmingham, AL 35205
Telephone: 205-328-9200
Facsimile: 205-328-9456

**GARNETT PATTERSON INJURY LAWYERS**

*/s/ Hunter Garnett*
Hunter Garnett
100 Jefferson St S #300
Huntsville, AL 35801
Telephone: 256-539-8686